The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this Honorable Court. Good morning. We have a single case for argument this morning, number 20-1010, T-Jat Systems 2006 Ltd. v. Expedia Group, Inc., Mr. Yonai. Thank you, Your Honor. It may please the Court. The term at issue here, we may shorten it to VCE, was a simple one for a person of ordinary skill in the art to understand and its meaning was practically undisputed by the experts. They agreed that a client was a well understood term that means a piece of software that manages the connection with a server. It connects to a server and requests a service or a file. So an AOL client is the software that connects to an AOL server. Now typically, it was operating on the end device where the user is located, but here this was a virtual client. So again, the experts understood that what was meant by a virtual client was that it was running on the intermediate server. So it's a stand-in or rather it impersonates a user in interacting with the application server. That is sufficient structure and the Court erred by looking for, by finding this to be functional claiming. It is not functional claiming by any stretch. The Court was looking for a variety of functions, whether it's what it considered to be translation or how the virtual client entity was created or in another, on page 10, it was looking for the structure of how the client connected to or requested a service, but that presupposes that this is a means plus function. Those are things that the client already does based on what people of ordinary skill in the art understand the client to do. So in this case, the virtual client, what it does is, it is the go-between between the server and the mobile phone. So that if the mobile phone is disconnected from the intermediate server, the virtual client entity maintains the connection to the application server and the user is able to continue interacting with the application when self-service is resumed. The two principal errors, I appreciate there are a number of things we briefed, the two principal errors. You're familiar with our recent decision in RAINN? I am, yes. And so that sort of answers one of your arguments in the brief that you couldn't have a means plus function limitation in a method claim, right? Well, the way, I think I understand the question, Your Honor. The way we read the case law is that a, let's call it an apparatus element within a means plus function claim would only be found that if it were devoid of structure. Whereas here, there is structure. It's not using, it doesn't use a nonce word such as means or module, which was the case in RAINN. It was a user identification module, which had no commonly understood meaning. But I suppose the questions can be conflated to whether virtual client entity had structure. I'm not sure if that answers your question, Your Honor. But I, what we think based on reading the case law is that the circumstances for finding 112 paragraph 6 for an apparatus element in a method claim are more limited than in an apparatus claim. The additional language in apparatus claims that we see that a structure is not sufficient to I don't believe I've seen any case of the court that has found that in a method claim. Every means plus function application in the method claim that we've seen was where there was no structure at all in the particular element. For that particular question, we are content to rest on our briefs. And what I would like to whether the virtual client entity and surrounding language included sufficient structure. And secondly, if we get to that, whether there was supporting structure in the specification if it were found to be means plus function. Counsel, this is Judge Moore. Is the virtual client entity a software program? Yes, Your Honor. That was understood by the experts. And if it's a software program, you think that is a sufficient structure for a one potential 112 paragraph 6 element? If the claim had said a software module, that would be a different matter. But here we're saying it's a client. And there was ample testimony from the experts, intrinsic evidence, dictionaries, even there was even a definition of a client in the file history here. This is like tech global, if I recall correctly, where the claim element was defined in the prosecution history. And that's what we had here that the inventors provided a dictionary definition during prosecution to the patent office that is sufficient for a structure. And what the client means here is that, for example, if you have a variety of internet-based applications, right? So, you have, for example, AOL as an example, provided in the patent. It's a bit outdated now, but you could only connect to an AOL service using an AOL client. You remember the disk that they used to mail ubiquitously, right? You put the program from that CD onto your computer, and that software was the AOL client. So, a client is the particular software that's associated with a server for connecting to that particular application server. That is a structure. It's a special purpose piece of software, and it's known in the art as such. Mr. Yone, this is Judge Lynn. Are you saying that the expression virtual client entity is the equivalent of a recitation of a program resident on a piece of structure like a server? The virtual client entity is a piece of specialized software residing on a computer, which is the intermediate server in this case. So, you are reading virtual client entity as if it was, as if it said a server program to function as a virtual client. Is that right? I'm not sure, Your Honor, that I understand the import of the question, but the claim tells us that the virtual client entity is resident on the intermediate server. The claim says, at a first server, creating a virtual client entity. So, that is resident on the first server. I think that would be a hard read, which it seems to me that virtual client entity, if it means anything, it has to simply refer to the software that emulates a client. It does refer to software, Your Honor. I agree with that, and I didn't mean to give the impression of disagreeing. The virtual client is a piece of software. The entity refers to, it's an instance, right? It's an executable instance of that. So, I don't believe we disagree. The virtual client entity is a program. That's correct. So, are you agreeing that this should be analyzed as a means plus function limitation? No, we do not agree with that. I, no, by calling it a program, that does not end the question, right? It is a program with a specific structure, and it has a particular, it has a known meaning and a structure to those of ordinary skill in the art. Well, it's a program with a known function. And that provides a structure. That, and I don't know if it's a meaningful distinction or not, but it's, for example, if we talked about a driver as a piece of software, that is a, that has a structure. It's not a general purpose software module. It's with a specific purpose, and it is known to those of skill in the art, right? So, when we talk about means plus function, right, it's any means for doing X. And it's not necessarily something known to those of ordinary skill, but here, because we're using technical terms that were known to those of skill, including, you know, by admission of both experts here, everybody knows what a client is. That does not put it in the realm of means plus function, because it is a known piece of software, and there is some case law we've cited to that effect as well. For example, I don't have the particular claims in mind right now, but just calling it software does not make it means plus function, of course. Where do the experts say that this is a known piece of software? I was reading the oral argument before the district court the other day, and I recall there was no dispute that it was known how to put a client on a server, and I- That's not an answer to my question. Where, for example, does your expert say that it's a known piece of software? Other than the definition provided during prosecution history, I'm looking here at Mr.- excuse me, Professor Bederson's declaration, and he says, for example, at appendix page 1791, that client server systems and protocols were very well known by the time of the invention, a server is a device on which data- Wait, wait, wait. 1791? Yes, your honor. Okay. Paragraph 43. Yeah. Second line, a server is a device on which data or services were located, and the client, or client software, is a computing device or software adapted to connect and request information from the server, and then there are various definitions of client that were provided based on dictionaries, technical references at the time of the invention. I don't read that as saying it's a known piece of software. Where does he say that? I would- I think if it's not in the- in heck verba, I don't believe it's a matter of dispute, and I would welcome my learned colleague, Mr. Angelou, to address whether that's in dispute. I don't believe there's a dispute in that. Counsel, this is Judge Moore. There's a difference between saying a programmer would know how to create a program that does this, which is what I think you have in the record, and saying it is a known, precise piece of software, which would mean that would be something known to have sufficient structure in a particular form. I mean, there's no doubt that record is replete with evidence that a skilled artist would know how to craft such a software program, but that's exactly the kind of circumstance where we've required an algorithm. We are not arguing for purposes of the first means plus function question, whether there's sufficient structure, that one would know how to do it. We are saying that it is a known piece of software, and I don't think there's a dispute on that. There is an AOL server, for example, and an AOL client, which connected to the AOL server. A client is a known piece of software to those of skill in the art. There was- you know, if this were found to be means plus function, we have also identified an algorithm sufficient to show how the virtual client entity operates. That's a separate question. If it is construed as means plus function, the court made the mistake here with due respect of finding no algorithm at all. There is a dichotomy of cases of distinction, as the court knows, for example, as discussed in AllVoice, ePlus, and other cases, between whether there is no algorithm at all and whether there's a sufficient algorithm. If there's no algorithm, then we do not look to one of ordinary skill in the art, how that would be interpreted. But where the question is only the adequacy of the algorithm, and we did point to an algorithm here, if it's the adequacy of the algorithm, then the court should have looked to the expert evidence that one of ordinary skill in the art would have known how to implement the virtual client entity. But counsel, we've said over and over again, the fact that a skilled artisan would know how to do it doesn't satisfy your obligation, if you have one, of disclosing precisely how you're claiming it be done through a particular algorithm. So the evidence you presented on that, at least the way you just framed it, would not satisfy our test. Again, I think what we, what the court, reading the court's opinion, the court said there was no algorithm at all. You know, one error was that it misidentified the function. It said there's nothing for telling you how the virtual client entity is created, which is the incorrect function. When we look at the function of allowing communication, if that were the function between the phone and the application server, then there is ample algorithm. There's authenticating the user, there's requesting a service, and there's providing it to a user's telephone using, for example, an HTML page. That is an algorithm. There's no further skill in the art. That is what we understand the case law to mean, based on the sufficiency line of cases, not the no algorithm at all line of cases. Okay, Mr. Ione, you're into your rebuttal time. We'll let you save two minutes. Thank you. Mr. Angeles? Good morning, and may it please the court. I just want to confirm, can the court hear me okay? Yes, we can hear you. Thank you. Thank you. So, let me just begin by saying there very much is a dispute about whether a virtual client entity refers to some particular known software. And so, on the, what I'll call the first prong of the Williamson test, whether there is sufficiently definite structure recited, what our friends on the other side are arguing is that, essentially, this case is analogous to the zero-click case, because this is a reference to some particular known software. But there are several fatal problems with that argument. Among the first is that virtual client entity is a coined term, as the district court found on page 10 of the appendix. So, it's not in common parlance as a term for particular structure, and we know that from the advanced ground case. The structure is only what the words themselves connote to one of skill in the art, you know, in light of the intrinsic record. It's also the alleged advance over the prior art and the point of novelty, and the district court found that as well on page 11 of the appendix. And in addition, it's a non-structural term, as the district court explicitly found. So, recall that the district court, for purposes of its analysis, adopted Dr. Batterson's opinion about what the virtual client entity is. And it's not a client of any identified sort. Instead, it's a program that, quote, when executed, is perceived by the server to be a client. And Dr. Batterson further said, quote, it is not in actuality the client software expected by the server. So, it's something new. It's some new animal that allows communication between an internet-based application. It's not known structure in the art, and for that reason, the term virtual client entity does not recite sufficiently different, sufficiently definite structure. But there's a second issue as well, the second prong, what I'll call the second prong of Williamson, on the structure sufficient to perform the recited function. And here, again, the district court made explicit factual findings. And what we have is Dr. Batterson saying that the virtual client entity has to do two things. It has to not only allow connection to occur, which, of course, a program can connect to another program, but it has to allow some sort of conversion operation to occur, to allow the incompatible telephone device and internet-based application to talk to one another. And what the district court explicitly found was that Dr. Batterson said that's an implementation detail, essentially conceding that there is nothing in the term virtual client entity that explains the way in which that software converts the information from one form into another to allow the communication to occur between these two devices, between the internet-based application and the telephone device. And Judge Andrews, in his opinion, cited directly to that portion of Tijat's argument, where paragraph 50, we were talking earlier about Dr. Batterson's report. Paragraph 50, which is on 1793 of the appendix, is what is cited by Tijat in its brief at 925. And there, Dr. Batterson is explicit. There's got to be a conversion that happens. This is what this virtual client entity does. And the reason why Judge Andrews found that even accepting the opinion of Dr. Batterson, this extrinsic evidence as fact, what the extrinsic evidence showed is that this implementation detail is just missing from the record. This idea of how the conversion, the way in which this conversion happens, which is what's required for the allowing communication function to occur, is not there within the intrinsic record. And so as a result of that, there is not structure sufficient to perform the recited function. So given that, we think that both prongs of the Williamson test, counsel, indicate quite clearly that this claim term is governed by 112.6. So in light of that, the next step in the analysis is that the court has to turn to the specification to see whether there's an algorithm that is disclosed for that function, the allowing communication. And here, there is no corresponding structure in the specification. And so there's no dispute that this is a question of fact. We've cited the Buddy case, B-U-D-D-E. It may be Bud. I've never known. But to me, this burden expedia identified all the places where TJAT suggested there was structure and explained that there is not, in fact, structure in the specification. And the district court said, essentially, yes. Don't you think the word entity is kind of like the word module or mean? I do. I do, Your Honor. And I think my learned colleague on the other side pointed out that my answer was a little confusing before Judge Andrews when I said yes and no. I completely agree that the term module. But what I was saying in my answer when I said yes and no is that not only is entity a nonce term, but virtual client entity is a nonce term defined solely by its functions, which is what Judge Andrews found on the question of whether 112.6 applies. And so I agree completely with that, Your Honor. So, again, in terms of what the specification discloses, figure four is what below was identified as the algorithm. And there's just no algorithm there. So there's element 150, which is the box that says create the VCE. And there's no structure there whatsoever. There's element 160, which establishes, it says establish a session. And that just essentially restates the function that communication is going to occur. This idea that communication is going to occur, restating the function, we've cited many cases in our brief, that restating the function is not an algorithm and can't satisfy the algorithmic requirement. Then there's element 170, where the application, not the virtual client entity, the application authenticates the user. And your column seven of the specification makes it clear that it's the application doing that. And then finally, there's element 180, where there's a discussion of how the VCE, excuse me, how the telephone receives files. But during argument below, there was a discussion about whether that element had anything at all to do with the VCE, because we were discussing dependent claims five and 10 of the 434 patent that talk about that element. And it was agreed, this is on appendix 918, that that element really has nothing at all to do with the VCE. Now, before this court, there was a discussion of figure five as well. And figure five, respectfully, is just a red herring. It doesn't even mention the virtual client entity. And it literally has nothing to do with the structure of the virtual client entity and how it performs this converting function that's required for communications to occur. It deals with a situation where there's non-connected, where there's a lack of and the internet-based application. And in that situation, there would be no VCE as the claim itself teaches us. So it's an unclaimed embodiment that has nothing at all to do with the virtual client entity. The idea that Judge Andrews didn't consider what was put forward with figure four, for example, is just incorrect. His opinion is replete with that. And we can contrast what's there with some of the cases that were cited. So, for example, in the intelligent automation design case that was cited by TJAT, there you had an algorithm. The issue there was essentially a torque determination. It was essentially, it would have added to a drilling situation. And so there, the algorithm was, you receive a filtered analog current signal representing torque and smoothing it. And then the microprocessor measures and monitors the value of the signal after there's a receiving and smoothing done. The microprocessor detects a decrease in current, signifying that the torque has begun dropping, and therefore the screw has reached the point of grip. So that's the kind of thing that we're looking for for an algorithm. Here, there's a complete absence of any algorithm for the conversion that has to occur. So finally, I'll just move briefly to the issue of 101. Here, we offer this because it is certainly the case that 112.6 can be an issue that sometimes can be difficult. I think it's very straightforward here, but if the court is inclined to address 101 instead of 112.6, we believe that that issue is fully before the court for resolution. It's ripe. Unlike what was said in TJAT's brief, there was no deferral of the 101 issue because of a need for factual development. To the contrary, the only deferral was to allow claim construction to occur of the term virtual client entity. And that having occurred, Judge Andrews explicitly said in his ruling on claim construction that that essentially resolved the 101 issue. And because of that, the claim term is purely functional. It's defined only by its functions. And because of that, the familiar 101 law would dictate that because there is no way in which the virtual client entity is identified as performing the recited functions under cases like two-way media and American Axel, and of course, the district court opinion where Judge Bryson was sitting by designation in Epic IP, where you have this kind of functional language that's exactly the harbinger of an attempt to own every way of communicating. So for purposes of both 112.6 and for 101, you have a situation where there's a serious preemption problem. There's an attempt to own the way in which an old-fashioned telephone device would communicate with an internet-based application and to own every way of doing that by just saying there's some magic virtual client entity in the middle that makes that happen. What we need is a particular way of accomplishing that. And that's what would have been necessary to allow this claim to be definite. And if the court has no questions, I'm happy to end my presentation there. Okay. Hearing no questions. Thank you, Mr. Angelos. Mr. Ione, you have two minutes. Thank you. One question of Judge Moore's that I'll address about entity. I don't believe there's any evidence that entity is a commonplace word for a generic word-like module. Secondly, with a word-like client that does have structure, appending entity to it does not suddenly render it devoid of structure. For example, a wireless device means, in one of the cases that we've seen, was found to be not means plus function. And where the court accepted our definition of virtual client entity, that should have provided sufficient structure. About the question of conversion, there's no function recited in the claim for conversion. And so there's a bit of bootstrapping going on here. If we're looking for a conversion function, which is not in the claim, then we don't find it in the specification, because that is not the express function, right? Mr. Ione, this is Judge Lynn. If there's no conversion, how in the world would a telephone communicate with an app, an internet app? With due respect, it doesn't. It communicates with the intermediate server. It communicates with the virtual client entity. And the virtual client entity is the stand-in that communicates with the application server. There's no direct communication between the phone and the application server. It's an intermediary. It's a relay. It's the device that performs the necessary function of translating data in one format that is recognized by a telephone to data that's recognized by another format, namely the app. That may be a metaphor, but I don't believe it's expressed in the claims as such. What happens when data comes in through the connection to the application server, you know, it comes to the intermediate server, to the virtual client entity, and that just sends it along using, for example, HTML. That's disclosed in the patent. There's no need for any, you know, the metaphor in the district court was Japanese to English or some such. There's no conversion. The purpose of the virtual client entity is to keep alive that connection and to pass along whatever comes to the mobile phone when the mobile phone is available. Okay, Mr. Yoni, unless my colleagues have any questions, I think we're out of time. Thank you. Thank you, Mr. Yoni. Thank you, Mr. Angeles. The case is submitted. That concludes our session for this morning. The Honorable Court is adjourned from day to day.